1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WELLS FARGO TRUST COMPANY,
NATIONAL ASSOCIATION, formerly known
as WELLS FARGO BANK NORTHWEST,
N.A., in its capacity as Trustee of the Waste
MGT (Seattle) CTL Pass-Through Trust U/D/T
dated as of April 21, 2014,

               Plaintiff,

    v.

JONATHAN K. MARKOFF, an individual,

               Defendant.

CASE NO. C17-1862-JCC

ORDER

This matter comes before the Court on Plaintiff's motion for summary judgment (Dkt.
No. 24) and Defendant's cross-motion for summary judgment (Dkt. No. 28). Having thoroughly
considered the parties' briefing and the relevant record, the Court finds oral argument
unnecessary and hereby GRANTS in part and DENIES in part Plaintiff's motion for summary
judgment and DENIES Defendant's motion for summary judgment for the reasons explained
herein.

I.      **BACKGROUND**

    Plaintiff is a pass-through trust. (Dkt. No. 27 at 2.) DeNovo was a limited liability
company created by Defendant for the purpose of conducting the specific transactions at issue in

this case. (Dkt. No. 25-3 at 6–7.) Defendant was the managing member of DeNovo. (*Id.* at 6.)

In April 2014, DeNovo borrowed $15,590,238.15 from Plaintiff (the "A1 Loan") to fund its purchase of industrial property located at 7400 8th Avenue South, Seattle, WA (the "Property") from 8th Avenue Terminals, Inc. (Dkt. No. 27 at 2.) The Property requires significant environmental remediation measures; it is located within a federal superfund site, and is subject to a state agency order requiring remediation of substantial contamination. (*Id.* at 2–3.) Upon purchasing the Property, DeNovo assumed these environmental remediation obligations. (*Id.* at 3.)

DeNovo executed a lease (the "Ground Lease") that leased the Property to Waste Management National Services, Inc. ("WMNS") as part of the A1 Loan transaction. (Dkt. No. 27-6.) WMNS's rent payments pursuant to the Ground Lease were directed to Plaintiff to satisfy DeNovo's obligation to service the A1 Loan. (Dkt. No. 1 at 3.) The Ground Lease prohibited WMNS from "terminat[ing] or cancel[ing] the lease or alter[ing] its obligations to pay Basic Rent and Additional Rent as such amounts come due . . . ." (Dkt. No. 27-6 at 37.) DeNovo assigned the right to receive rent payments by WMNS under the Ground Lease to Plaintiff pursuant to an assignment of leases and rents executed by DeNovo in favor of Plaintiff. (Dkt. No. 27-3.) DeNovo could not agree to amend or supplement the Ground Lease without Plaintiff's prior written consent. (Dkt. No. 27-3 at 8.) WMNS agreed that any amendment or modification of the Ground Lease would not be effective against Plaintiff unless Plaintiff consented in writing. (Dkt. No. 27-4.)

Plaintiff and DeNovo executed a Deed of Trust (the "Deed") securing the A1 Loan. (Dkt. No. 27-2.) The "Events of Default" provision of the Deed included: (1) default in the payment of interest, principal, or premium when due; (2) any materially untrue statement, certification, representation, or warranty by DeNovo in connection with the transaction; (3) failure by DeNovo to discharge or appeal a judgment for the payment of money within 60 days of entry; (4) DeNovo's default under any mortgage or security agreement on the Property that is accelerated

as a result of the default; and (5) DeNovo consenting or acquiescing to the appointment of a receiver of itself or of the whole or any substantial part of its assets. (Dkt. Nos. 24 at 8–9, 27-2 at 49–51.) Under the Deed, "[w]hen any Event of Default . . . has occurred, then the Note [memorializing the A1 Loan] shall immediately become due and payable without presentment, demand or notice of any kind . . . ." (Dkt. No. 27-2 at 51.)

As part of the A1 Loan transaction, Defendant executed an Indemnity and Guaranty Agreement (the "Guaranty") in favor of Plaintiff. (Dkt. Nos. 27 at 3, 27-5.) The Guaranty was governed by Washington law. (Dkt. No. 27-5 at 10.) Plaintiff required Defendant to indemnify it "from and against, and guarantee payment to [Plaintiff] of, the Recourse Obligations set forth herein . . . ." (*Id*. at 3.) Defendant guaranteed:

> payment to [Plaintiff] of, hereby agrees to pay, protect, defend and save [Plaintiff] harmless from and against, and hereby indemnifies [Plaintiff] from and against any and all liabilities, obligations, losses, damages, costs, and expenses (including, without limitation, reasonable attorneys' fees), causes of action, suits, claims, demands and judgments of any nature or description whatsoever (collectively, "*Costs*") which may at any time be imposed upon, incurred by or awarded against [Plaintiff] to the extent such Costs result directly from the occurrence of any one or more of the following (collectively, the "*Recourse Obligations*"):
>
> > (ix)    [DeNovo's]    own    acts    of    gross    negligence,    fraud    or misrepresentation, willful misconduct or bad faith; . . .
>
> > (xiii)   the failure by [DeNovo] to fulfill any obligation (monetary or otherwise), if any, imposed upon [DeNovo] and not assumed by [WMNS] under the [Ground] Lease . . . ;
>
> > (xiv)   failure by [DeNovo] to discharge mechanic's liens and other monetary encumbrances and judgment liens against the Property in violation of the Deed of Trust and caused by [DeNovo] and not caused by [Plaintiff] or [WMNS] . . . .

(Dkt. No. 27-5 at 3–5.) Defendant agreed that his liability under the Guaranty would be "unconditional and absolute," and that Plaintiff was not required to pursue other remedies prior to suing to enforce its rights under the Guaranty. (*Id*. at 5, 9.) Defendant waived his right to require Plaintiff to institute proceedings against other entities prior to proceeding against

Defendant pursuant to the Guaranty. (*Id.* at 7.)

On July 10, 2014, Plaintiff loaned an additional $4,809,633.48 to DeNovo (the "A2 Loan"). (Dkt. Nos. 27 at 2, 27-7.) In connection with the A2 Loan, DeNovo entered into a Tenant Estoppel Certificate with WMNS, under which DeNovo committed to design, develop, and construct a permanent rail spur on the Property (the "rail improvement project"). (Dkt. Nos. 27, 27-6.) WMNS agreed to increase the monthly rent payment due under the Ground Lease by $44,583.33, the amount necessary to service the A2 Loan. (Dkt. Nos. 24 at 10–11, 27-6 at 2, 76.) Plaintiff agreed to the amendment of the Ground Lease and was assigned DeNovo's rights under the amended Ground Lease as collateral, and the increased rent was intended to service the A2 Loan. (Dkt. No. 27-8.) The Deed and Guaranty were amended to apply to the A2 Loan. (*Id.* at 5, 8.)

Because the A2 Loan was intended to fund the construction of the rail improvement project, DeNovo executed a closing certificate (the "Certificate") certifying that the A2 Loan constituted "Additional Approved Debt" under the Deed. (Dkt. Nos. 25-3 at 18, 27-9 at 2.) To qualify as "Additional Approved Debt," the A2 Loan proceeds had to "be used to pay the cost of construction of additions to the [Property] as requested by [WMNS] and closing costs incurred in connection with the issuance of [the A2 Loan] and other related costs . . . ." (Dkt. No. 27-2 at 16.)

On July 10, 2014, DeNovo received a total of $4,533,182.95 from the A2 Loan and deposited it in a Morgan Stanley account ending in 591. (Dkt. Nos. 26 at 3, 26-2 at 6.) DeNovo transferred that exact amount of funds to a Morgan Stanley account ending in 853 from July 11 to July 18. (Dkt. Nos. 26-2 at 6, 26-3 at 6.) Between July and September 2014, DeNovo made several disbursements from the 853 account, including transfers to Defendant, an account held in Defendant's former wife's name, DeNovo's corporate affiliates and their employees, and a Morgan Stanley "Active Asset Account." (Dkt. Nos. 25-3 at 59–60; 26-3 at 6, 14.) Although DeNovo deposited $274,454.12 into the 853 account, by the end of September 2014 the 853

account's balance was $9,804.49. (Dkt. No. 26-3 at 14, 18.)

In September 2014, DeNovo ceased working on the rail improvement project; DeNovo and WMNS blamed one another for the suspension of the project. (Dkt. Nos. 25-1 at 9, 66–68; 25-3 at 21, 27, 29, 63–68.) In June 2015, DeNovo and WMNS entered into a letter agreement which stated that DeNovo remained responsible for completion of the rail improvement project and that WMNS would be responsible for installing temporary rail because the rail improvement project "was suspended in September 2014." (Dkt. No. 25-1 at 36.) Plaintiff was not made aware of the letter agreement until it conducted discovery in this case, and "did not consent to the . . . letter agreement . . . or the purported 'suspension' of the Rail Improvement Project in violation of the WMNS Lease Amendment." (Dkt. No. 27 at 4.)

In late 2015 and early 2016, a number of liens were recorded against the Property. In August 2015, West Rail Construction Company recorded an $88,592.14 mechanic's lien against the Property. (Dkt. No. 25-1 at 18–19, 41–44.) In October 2015, the Washington Department of Ecology ("DOE") recorded a $246,375.96 lien against the Property. (*Id.* at 39.) On January 15, 2016, Anchor QEA, LLC, an environmental consulting firm retained by DeNovo, recorded a $300,705.00 mechanic's lien and a $541,156.71 judgment lien against the Property. (*Id.*; Dkt. No. 25-2 at 38–39.) On January 28, 2016, Perkins Coie, DeNovo's former law firm, recorded a $60,915.68 judgment lien against the Property. (Dkt. Nos. 25-1 at 39, 25-2 at 42–43.)

In November 2016, WMNS notified DeNovo in writing of DeNovo's failure to perform its obligations under the Ground Lease. (Dkt. No. 25-1 at 45–48.) WMNS stated that DeNovo failed to make stormwater improvements, remove the liens against the Property, and provide a substitute guarantor after DeNovo did not have the minimum liquid net worth required under the Ground Lease. (*Id.* at 46–48.) On September 26, 2016, Plaintiff sent a letter to DeNovo and Defendant notifying them of DeNovo's default under the A1 and A2 Loans, as DeNovo had not completed required environmental remediation on the Property or removed the liens recorded against the Property. (Dkt. No. 27-10 at 2.) Plaintiff sent a second default letter in October 2016.

(Dkt. No. 27-11.)

In December 2016, 8th Avenue Terminals filed a lawsuit against DeNovo for breach of the purchase agreement between them. (Dkt. No. 25-4.) After DeNovo failed to respond, 8th Avenue Terminals was granted judgment in the amount of $22,003,323.25; the judgment was recorded as a judgment lien against the Property. (Dkt. Nos. 25-2 at 61, 25-5.)

In February 2017, WMNS stopped making rent payments due under the Ground Lease amendment in light of DeNovo's failure to pursue the rail improvement project. (Dkt. No. 27 at 5.) DeNovo defaulted on the A2 Loan almost immediately; Plaintiff has not received payments on the A2 Loan since WMNS stopped making rent payments. (*Id*.) As of November 30, 2018, the total amount due under the A2 Loan was $4,602,471.47. (*Id*.)

In February 2017, WMNS filed a lawsuit against DeNovo in state court for breach of the Ground Lease. (Dkt. Nos. 25 at 3, 26-5.) After DeNovo failed to respond, WMNS was awarded a default judgment, and recorded a judgment lien of $143,151.61 against the Property. (Dkt. Nos. 25-2 at 57–58, 25-7.) In June 2017, WMNS filed a second lawsuit against DeNovo seeking partial rescission of the Ground Lease and restitution totaling $946,281.18. (Dkt. No. 25-8.)

In July 2017, following a petition by 8th Avenue Terminals, the state court appointed Pacific Realty Advisors, LLC (the "Receiver") as the general receiver for DeNovo. (Dkt. Nos. 25-9, 26-1.) The Receiver's appointment stayed WMNS's second lawsuit and other actions brought against DeNovo or the Property. (Dkt. No. 25-2 at 58.) Due to DeNovo's lack of financial assets, the Receiver was unable to perform DeNovo's obligations under the Ground Lease or cure DeNovo's various defaults. (Dkt. No. 25-2 at 11, 32, 52–53, 56.) Plaintiff sent DeNovo and Defendant a third default letter regarding the non-payment of the A2 Loan. (Dkt. No. 27-12.)

In December 2017, Plaintiff filed this action against Defendant for damages pursuant to the Guaranty. (Dkt. No. 1.) Plaintiff initially sought damages of at least $18,362,259.32 for DeNovo's defaults under the A1 and A2 Loans. (*Id*. at 10.) Plaintiff and Defendant have each

moved for summary judgment. (Dkt. Nos. 24, 28.)[1] Subsequent to the parties filing their respective motions for summary judgment, Plaintiff notified the Court that the Receiver has brokered a settlement between Plaintiff, WMNS, 8th Avenue Terminals, and the parent companies of WMNS and 8th Avenue Terminals. (Dkt. No. 36 at 5.) For the purposes of this case, Plaintiff "is now asserting only those losses incurred under the A2 Loan." (*Id*. at 4.) Thus, Plaintiff now seeks approximately $1,975,496.47 from Defendant for breach of the Guaranty, constituting the outstanding balance of the A2 Loan less the cash payment Plaintiff received under the settlement agreement. (*Id*. at 6.)

## II.  DISCUSSION

### A.  Summary Judgment Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making such a determination, the Court must view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Material facts are those that may affect the

---

[1] Although Plaintiff's motion for summary judgment purportedly seeks summary judgment on the entirety of its claim against Defendant, Plaintiff has only provided substantive argument on the issue of whether any of the Recourse Obligations listed in the Guaranty occurred. (Dkt. No. 24 at 20–30.) Plaintiff provides conclusory statements that its claimed losses constitute "Costs" under the Guaranty, and that such "Costs" were caused by the alleged Recourse Obligations. (*Id*.) Similarly, Defendant's motion for summary judgment seeks dismissal because Plaintiff cannot establish the existence of "Costs" or a causal connection between such "Costs" and the alleged Recourse Obligations, but does not contend that no Recourse Obligation occurred. (Dkt. No. 28 at 12–23; *see* Dkt. No. 30 at 2) ("The Markoff MSJ assumed for the purposes of the motion that a Recourse Obligation had occurred but rebutted the existence of the requisite direct causal connection between the alleged 'Costs' . . . and the alleged Recourse Obligations.")

outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248–49. Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888–89 (1990). Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

### B.    Washington Guaranty Law

"A 'guaranty' is 'a promise to answer for the debt, default, or miscarriage of another person.'" *Sauter ex rel. Sauter v. Houston Cas. Co.*, 276 P.3d 358, 362 (Wash. Ct. App. 2012) (quoting *Wilson Court, Ltd. P'ship v. Tony Maroni's, Inc.*, 952 P.2d 590, 598 (Wash. 1998)). A guaranty is a collateral agreement separate from the underlying contract, which creates obligations on the part of the principal debtor and the guarantor and is governed by its own terms. *Wilson Court*, 952 P.2d at 598; *McAllister v. Pier 67, Inc.*, 465 P.2d 678, 681 (Wash. Ct. App. 1970). "An absolute guaranty is an unconditional undertaking on the part of the guarantor that the person primarily obligated will make payment or will perform, and such a guarantor is liable immediately upon default of the principal without notice." *Century 21 Prod., Inc. v. Glacier Sales*, 918 P.2d 168, 171 (Wash. 1996) (quoting *Joe Heaston Tractor & Imp. Co. v. Sec. Accept. Corp.*, 243 F.2d 196, 200 (10th Cir. 1957)). "A conditional guaranty is an undertaking to pay or perform if payment or performance cannot be obtained from the principal obligor by reasonable diligence." *Id*.

"[C]ontracts to answer for the debt of another must be explicit and are strictly construed." *Wilson Court*, 952 P.2d at 597 (citing *Seattle-First Nat'l Bank v. Hawk*, 562 P.2d 260, 263 (Wash. Ct. App. 1977)). But "where a guarantor freely and voluntarily guarantees the payment of another, and a creditor relies to its detriment on this guaranty, the law generally requires the guaranty to be enforced." *In re Spokane Concrete Prod., Inc.*, 892 P.2d 98, 103 (Wash. 1995).

"Waiver provisions in guaranties are uniformly upheld and enforced by Washington courts, including on summary judgment." *Union Bank, N.A. v. Blanchard*, 378 P.3d 191, 197 (Wash. Ct. App. 2016). If the guarantor properly waives its counterclaims and defenses, "the only defense remaining . . . would be actual payment." *Id*. at 198.

"Because guaranties are contracts, they are subject to the general rules of contract formation, interpretation, and construction." *Frontier Bank v. Bingo Investments, LLC*, 361 P.3d 230, 236 (Wash. Ct. App. 2015) (citing *Wilson Court*, 952 P.2d at 594). Washington follows the objective manifestation theory of contracts, under which courts look to the objective manifestations of the agreement to determine the parties' intent. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 115 P.3d 262, 267 (Wash. 2005). The words used in the contract are given "their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." *Id*. Interpretation of a contract is a question of law when "(1) the interpretation does not depend on the use of extrinsic evidence, or (2) only one reasonable inference can be drawn from the extrinsic evidence." *Tanner Elec. Corp. v. Puget Sound Power & Light Co.*, 911 P.2d 1301, 1310 (Wash. 1996).

### C.    Occurrence of a Recourse Obligation

One of the requirements for Defendant's liability under the Guaranty was the occurrence of a Recourse Obligation listed in the Guaranty. (Dkt. No. 27-5 at 4.) Plaintiff has moved for summary judgment on the issue of whether a Recourse Obligation defined by the Guaranty occurred. (Dkt. No. 24 at 22–28.) Each claimed Recourse Obligation will be examined in turn.

#### 1.    DeNovo's Gross Negligence, Fraud or Misrepresentation, Willful Misconduct, or Bad Faith

A Recourse Obligation under the Guaranty was, "[DeNovo's] own acts of gross negligence, fraud or misrepresentation, willful misconduct or bad faith." (Dkt. No. 27-5 at 4.) In Washington, "gross negligence" has been defined as "the failure to exercise slight care, mean[ing] not the total absence of care but care substantially or appreciably less than the

quantum of care inhering in ordinary negligence." *Swank v. Valley Christian Sch.*, 398 P.3d 1108, 1120 (Wash. 2017) (quoting *Nist v. Tudor*, 407 P.2d 798, 803–04 (Wash. 1965)). To establish gross negligence on summary judgment, "the plaintiff must offer something more substantial than mere argument that the defendant's breach of care arises to the level of gross negligence." *Johnson v. Spokane to Sandpoint, LLC*, 309 P.3d 528, 533 (Wash. Ct. App. 2013). In the context of a contractual relationship, "bad faith does not require evidence of an intentional, wrongful act . . . negligence or gross negligence suffices to support a finding of bad faith." *Francis v. Wash. State Dep't of Corr.*, 313 P.3d 457, 465 (Wash. Ct. App. 2013) (discussing RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. d).

DeNovo received the A2 Loan proceeds in the 591 account in July 2014, transferred the proceeds to the 853 account, and then disbursed the proceeds to a number of entities and individuals. (Dkt. Nos. 26-2 at 6, 26-3 at 6, 14.)[2] The Certificate and Deed restricted DeNovo's use of the A2 Loan proceeds to "pay[ing] the cost of construction of additions to the [Property] as requested by [WMNS] and closing costs incurred in connection with the issuance of [the A2 Loan] and other related costs." (Dkt. Nos. 27-2 at 16, 27-9 at 2.) Thus, the Certificate and Deed imposed a duty on DeNovo to use the A2 Loan proceeds for specific purposes, with a corresponding responsibility to be able to account for how the funds were expended.

One of DeNovo's disbursements of the A2 Loan proceeds, a $1,000,000 transfer to the

---

[2] Defendant contends that there is a genuine dispute of material fact concerning whether the funds transferred from the 591 account to the 853 account were the A2 Loan proceeds, as the 591 account had an existing balance of $4,225,307.39 when the A2 Loan proceeds were received. (Dkt. No. 30 at 13–14; *see* Dkt. No. 26-2 at 3, 6.) Justifiable inferences must be drawn in the light most favorable to Defendant as the nonmoving party on this issue. *Anderson*, 477 U.S. at 255. But no such inference may be drawn here, where the amount transferred from the 591 account to the 853 account was the exact amount of the A2 Loan proceeds initially deposited in the 591 account, (Dkt. Nos. 26-2 at 6, 26-3 at 6), and Defendant's declaration in support of his opposition to Plaintiff's motion for summary judgment assumes that the relevant disbursements were comprised of the A2 Loan proceeds. (*See* Dkt. No. 32 at 14–15 (using title "Use of A2 Loan Proceeds"), *cf*. Dkt. No. 26-3 at 6.) Therefore, there is no genuine dispute of material fact on the issue of whether the disbursements from the 853 account were comprised of the A2 Loan proceeds.

Active Asset Account, breached this duty. (Dkt. No. 26-3 at 6.) During his deposition, Defendant was unable to name the holder of the Active Asset Account and gave conflicting answers as to whether the funds went to DeNovo Constructors; his declaration is silent as to this disbursement. (Dkt. No. 25-3 at 52; *see* Dkt. No. 32 at 14–15.) Rather than offer evidence demonstrating that this disbursement was properly used pursuant to the Certificate and Deed, Defendant's opposition to Plaintiff's motion for summary judgment asks the Court to not consider this particular disbursement because "this receiving account and recipient is unknown to all parties." (Dkt. No. 30 at 15 n. 11.) This argument ignores DeNovo's duty to use the A2 Loan proceeds consistent with the Certificate and Deed. Further, no reasonable inference can be drawn that the $1,000,000 disbursement to the Active Asset Account was within the scope of the Certificate and Deed's restriction when the entity responsible for ensuring the proper use of the A2 Loan funds cannot definitively name the owner or purpose of the Active Asset Account. *See* Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at 255. Therefore, DeNovo's $1,000,000 disbursement to the Active Asset Account breached its duty to use the A2 Loan proceeds consistent with the Certificate and Deed.

Further, this disbursement constituted gross negligence or bad faith on the part of DeNovo. Although DeNovo disbursed nearly a quarter of the A2 Loan proceeds to the Active Asset Account in a single transaction, Defendant could neither name the owner of the account nor specify the purpose for the disbursement. (*See* Dkt. Nos. 25-3 at 52, Dkt. No. 32 at 14–15.) Further, Defendant testified that he was unaware of the Certificate and Deed's restriction on DeNovo's use of the A2 Loan proceeds when DeNovo obtained the A2 Loan. (Dkt. No. 25-3 at 44–45.) DeNovo's transfer of $1,000,000 of the A2 Loan proceeds to an account—without being able to name the account's owner or purpose and while being unaware of its contractual obligation to use the A2 Loan proceeds for specific purposes—constitutes a failure to exercise slight care sufficient to establish a finding of gross negligence or bad faith. *See Swank*, 398 P.3d at 1120; *Francis*, 313 P.3d at 465. Defendant has not offered evidence demonstrating that

DeNovo's disbursement or Defendant's lack of knowledge did in fact constitute an exercise of slight care.

Therefore, Plaintiff has carried its burden of establishing that there is no genuine dispute of material fact on the issue of whether DeNovo's disbursement of $1,000,000 to the Active Asset Account constituted gross negligence or bad faith. Thus, Plaintiff has established that the corresponding Recourse Obligation under the Guaranty occurred and Plaintiff's motion for summary judgment is GRANTED on this issue.[3]

But Plaintiff has not established that there are no genuine disputes of material fact as to the remaining disbursements cited by Plaintiff. These include transfers to DeNovo Constructors, Defendant himself, an account held in Defendant's former wife's name, and Sam Mangrum. (Dkt. No. 24 at 23–25.) But the evidence before the Court only conclusively shows that these transfers were made. (*See* Dkt. No. 26-3 at 6, 14.) Although Plaintiff points to Defendant's testimony that DeNovo used the A2 Loan funds for direct and indirect costs it incurred, Plaintiff has not demonstrated that such costs violated the Certificate and Deed's restriction on DeNovo's use of the A2 Loan proceeds. (*See* Dkt. Nos. 25-3 at 46–48, 36 at 11–12.) Absent evidence showing that these disbursements were in fact used for purposes outside the scope of the restriction, summary judgment in favor of Plaintiff is not appropriate. Therefore, Plaintiff's motion for summary judgment is DENIED as to these disbursements.

Plaintiff also contends that DeNovo was grossly negligent or acted in bad faith by submitting "the False Closing Certificate" and failing to complete the rail improvement project.

---

[3] Defendant argues that any "bad faith," "gross negligence," or "willful misconduct" triggering liability under the Guaranty as a Recourse Obligation "should be read to mean something other than breach of the loan documents or (Operative Agreements)." (Dkt. No. 30 at 12; *see also* Dkt. No. 30 at 10 n.10.) Defendant does not provide legal authority or a provision in the Guaranty supporting his assertion, and Defendant's argument ignores that the Guaranty is a separate agreement governed by its own terms. (*Id.*); *Wilson Court*, 952 P.2d at 598. Further, Washington courts have recognized gross negligence and bad faith in the context of contractual relationships, and Defendant has not established that such grounds cannot be premised on breach of a separate contractual agreement. *See Francis*, 313 P.3d at 465; *Swank*, 398 P.3d at 1120.

(Dkt. No. 24 at 23.) Despite the temporal proximity between DeNovo taking out the A2 Loan, transferal of the proceeds, and the suspension of the rail improvement project, Plaintiff has not provided substantive argument supporting its assertion that the Certificate was "false," or evidence of gross negligence or bad faith related to DeNovo's failure to complete the rail improvement project. (*See id*. at 23–25.) Therefore, Plaintiff has not carried its burden of establishing that there is no genuine dispute of material fact as to either issue, and its motion for summary judgment is DENIED on these issues.

2.  DeNovo's Failure to Fulfill Obligations Under Ground Lease

A Recourse Obligation under the Guaranty was "the failure by [DeNovo] to fulfill any obligation (monetary or otherwise), if any, imposed upon [DeNovo] and not assumed by [WMNS] under the Lease . . . ." (Dkt. No. 27-5 at 4.)

WMNS's representative testified that WMNS suspended its rent payments in January 2017 because of DeNovo's breaches of the Ground Lease. (Dkt. No. 25-1 at 25.) These included DeNovo's failure to make stormwater improvements, in violation of section 13.9 of the Ground Lease; failure to remove liens, in violation of section 31 of the Ground Lease; and failure to provide a substitute guarantor, in violation of section 47.2 of the Ground Lease and section 5.2 of the Guaranty. (*Id*. at 21; see Dkt. No. 27-6 at 27, 40, 47.)[4] WMNS's representative further testified that DeNovo has failed to cure these breaches, and the Receiver has testified that it has not taken steps to fulfill DeNovo's obligations under the Ground Lease since it was appointed.

_____

[4] In its motion for summary judgment, Plaintiff cited "the numerous letters sent by WMNS in late 2016 and early 2017" regarding DeNovo's failure to perform its obligations under the Ground Lease, as well as the default judgment WMNS obtained against DeNovo. (Dkt. No. 24 at 25.) Defendant contends that Plaintiff cannot rely on "WMNS *allegations* of various breaches by DeNovo and a *default* judgment obtained by WMNS" because the facts therein are unproven. (Dkt. No. 30 at 17) (emphasis in original). But WMNS has since offered sworn deposition testimony stating that the content of its letters was accurate. (*See* Dkt. No. 25-1 at 21–25.) The fact that these allegations were originally made in letters from WMNS to DeNovo or appeared in support of entry of default judgment against DeNovo does not excuse Defendant from his obligation to come forward with evidence to rebut this testimony to avoid summary judgment on this issue.

(*Id*. at 22–24; Dkt. No. 25-2 at 52–53, 56) WMNS's representative and the Receiver also testified that several of the liens against the Property were attributable to DeNovo; for example, the West Rail Construction Company's claim of lien identified DeNovo Seattle as the "person indebted to claimant," and liens obtained by Anchor QEA, LLC and Perkins Coie were based on unpaid work performed on behalf of DeNovo. (Dkt. Nos. 25-1 at 17–18, 63–64; 25-2 at 38–43).

In response, DeNovo contends that it could not make stormwater improvements because the DOE did not approve of the improvements, WMNS could not settle on a final design, and that WMNS called for work outside the scope of DeNovo's obligations. (Dkt. Nos. 25-3 at 31–33, 30 at 19–20.) Defendant also challenged WMNS's assertion that DeNovo Properties Holdings, LLC ("DPH") was not an adequate guarantor because, at the time WMNS made the assertion, it did not have "evidence as to the liquid net worth of DPH." (Dkt. No. 30 at 20.) Finally, Defendant argues that the Ground Lease's requirement to remove liens applied to both DeNovo and WMNS, that WMNS did not establish whether the liens were incurred by DeNovo or WMNS, and that DeNovo and WMNS disputed who was responsible for costs associated with the suspended rail improvement project. (*Id*. at 21.)

Defendant's arguments concerning the alleged cause of DeNovo's failure to perform its obligations under the Ground Lease do not rebut the evidence that DeNovo failed to perform such obligations. Further, Defendant cannot rely on DeNovo's own prior failure to produce documentation of DHP's liquid net worth to contend that DHP was an acceptable parent guarantor. (*See* Dkt. No. 25-1 at 21, 47) (testimony and letter from WMNS regarding DeNovo's inability to produce financial statements establishing that DHP maintained the requisite minimum net worth required under the Ground Lease). Finally, Defendant has failed to rebut the testimonial and documentary evidence in the record establishing that at least several of the liens against the Property were attributable to DeNovo.[5]

---

[5] Defendant also argues that the doctrine of impossibility and impracticability excused DeNovo from performing its obligations under the Ground Lease, that WMNS's interference with the rail improvement project excused DeNovo from performing its obligations, and that the

Plaintiff has met its burden of establishing that there are no genuine disputes of material fact on the issue of whether DeNovo failed to perform its obligations under the Ground Lease. Thus, Plaintiff has established that the corresponding Recourse Obligation under the Guaranty occurred and Plaintiff's motion for summary judgment is GRANTED on this issue

### 3. DeNovo's Failure to Discharge Liens

A Recourse Obligation under the Guaranty was "failure by [DeNovo] to discharge mechanic's liens and other monetary encumbrances and judgment liens against the Property in violation of the Deed of Trust and caused by [DeNovo] and not caused by [Plaintiff] or [WMNS] . . . ." (Dkt. No. 27-5 at 4.)

A number of liens have been imposed on the Property, including: West Rail Construction Company's $88,592.14 mechanic's lien (Dkt. No. 25-1 at 18–19, 41–44); the DOE's $246,375.96 lien (*id.* at 39); Anchor QEA, LLC's $300,705.00 mechanic's lien and $541,156.71 judgment lien (*id.*; Dkt. No. 25-2 at 38–39); Perkins Coie's $60,915.68 judgment lien (Dkt. Nos. 25-1 at 39, 25-2 at 42–43); 8th Avenue Terminals' $22,003,323.25 judgment lien (Dkt. Nos. 25-2 at 61, 25-5); and WMNS's $143,151.61 judgment lien. (Dkt. Nos. 25-2 at 57–58, 25-7.) Deposition testimony established that West Rail Construction Company's claim of lien identified DeNovo as the "person indebted to claimant." (Dkt. No. 25-1 at 17–18, 63–64.) Further testimony established that the liens of Anchor QEA, LLC and Perkins Coie were for unpaid work performed on behalf of DeNovo. (Dkt. No. 25-2 at 38–43.) The Receiver testified that it has not taken steps to remove the liens on the Property since receiving the Property. (*Id.* at 52–53.)

Defendant argues that "it is not enough for plaintiff to point to the mere existence of liens on the Property," and that DeNovo has continued to dispute whether it was responsible for the liens. (Dkt. No. 30 at 21–22.) Defendant further contends that there is a genuine dispute of

doctrine of equitable estoppel prohibits WMNS or Plaintiff from asserting that DeNovo breached the Ground Lease. (Dkt. No. 30 at 18–19). Defendant has not established that these doctrines apply and excuse DeNovo from performance of its obligations under the Ground Lease or preclude Plaintiff from raising arguments now.

material fact about whether the 8th Avenue Terminals and WMNS's judgment liens were caused by DeNovo because the underlying facts were not adjudicated or because those entities actually imposed the liens against the Property. (*Id*. at 22.) Defendant's arguments ignore the documentary and testimonial evidence establishing DeNovo's responsibility for the liens, and Defendant has not otherwise offered contradictory evidence. (*See id.* at 21–22.) Further, DeNovo's responsibility for the imposition of 8th Avenue Terminals and WMNS's judgment liens does not depend on the merits of the underlying cases or the other entities' responsibility for imposing the liens. Rather, DeNovo caused the judgment liens to be imposed against the Property by initially failing to defend against the claims and subsequently failing to challenge the default judgments.

Plaintiff has met its burden of establishing that there is no genuine dispute of material fact that DeNovo caused several liens to be imposed on the Property. Thus, Plaintiff has established that the corresponding Recourse Obligation under the Guaranty occurred and Plaintiff's motion for summary judgment is GRANTED on this issue

### D. Existence of "Costs"

The Guaranty defined "Costs" as "any and all liabilities, obligations, losses, damages, costs, and expenses (including, without limitation, reasonable attorneys' fees), causes of action, suits, claims, demands and judgments of any nature or description whatsoever . . . which may at any time be imposed upon, incurred by or awarded against [Plaintiff]." (Dkt. No. 27-5 at 4.) Defendant has moved for summary judgment on the issue of whether Plaintiff's claimed damages are "Costs" under the Guaranty. (Dkt. No. 28 at 15–18.)

In February 2017, WMNS refused to make the additional rent payments due under the amended Ground Lease. (Dkt. No. 27 at 5.) As a result, DeNovo almost immediately defaulted on the A2 Loan. (*Id*.) Plaintiff has not received payments on the A2 Loan since WMNS stopped making rent payments. (*Id*.) Plaintiff now seeks approximately $1,975,496.47 in damages, constituting the outstanding balance of the A2 Loan less the cash payment Plaintiff received as

part of the settlement agreement. (Dkt. No. 36 at 6.)

Defendant contends that DeNovo's default on the A2 Loan is not a Recourse Obligation, and therefore cannot serve as a basis for Defendant's liability under the Guaranty. (Dkt. No. 28 at 16.) But the Guaranty required that Plaintiff's "Costs result directly" from one of the Recourse Obligations specified by the Guaranty; DeNovo's default on the A2 Loan did not necessarily have to be a Recourse Obligation in order for the missed payments on the A2 Loan to constitute "Costs." (Dkt. No. 27-5 at 4.) Defendant also argues that the parties did not intend for Defendant to be liable for DeNovo's entire indebtedness (presumably the total of the A1 and the A2 Loans) upon the occurrence of a Recourse Obligation. (Dkt. No. 28 at 16–18.) As Plaintiff is only seeking the outstanding balance of the A2 Loan, less the cash received from the settlement agreement, (*see* Dkt. No. 36 at 4–6), the Court need not reach this issue. Defendant has not submitted evidence establishing that Plaintiff has in fact received payments on the A2 Loan or otherwise establishing that Plaintiff's claimed damages are not "Costs" under the Guaranty.

Defendant has failed to carry his burden of establishing that there is no genuine dispute that Plaintiff's claimed damages under the A2 Loan cannot constitute "Costs" within the broad definition of the Guaranty. Therefore, Defendant's motion for summary judgment is DENIED on this ground.

### E. Causation

The Guaranty applied to "Costs" that "result[ed] directly from the occurrence of any one or more of the" Recourse Obligations. (Dkt. No. 27-5 at 4.) Defendant has moved for summary judgment on the issue of whether Plaintiff's alleged damages resulted directly from the occurrence of a Recourse Obligation. (Dkt. No. 28 at 12.)

The parties direct the Court to Washington cases interpreting insurance contracts for guidance on interpreting the term "result directly" in the Guaranty. (Dkt. Nos. 28 at 14 n.6, 33 at 14.) In such cases, Washington courts have interpreted the phrase "result directly" to mean proximate cause. *Hanson PLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 794 P.2d 66, 73

(Wash. Ct. App. 1990) (concluding "that courts apply a proximate cause analysis when confronted with the term 'resulting directly' in an insurance policy"); *see also Moeller v. Farmers Ins. Co. of Wash.*, 229 P.3d 857, 862 (Wash. Ct. App. 2010) (concluding that the term "direct" "refers to [a] causal relationship, and is to be interpreted as limited to the harm resulting from an immediate or proximate cause as distinguished from a remote cause.").[6]

"The term 'proximate cause' means a cause which in a direct sequence, unbroken by any new independent cause, produces the injury complained of and without which the injury would not have happened." *Petersen v. State*, 671 P.2d 230, 241 (Wash. 1983). "Washington 'recognizes two elements to proximate cause: Cause in fact and legal causation.'" *Hartley v. State*, 698 P.2d 77, 82 (Wash. 1985). "Cause in fact refers to the 'but for' consequences of an act—the physical connection between an act and an injury." *Id*. at 83. "Legal causation . . . rests on policy considerations as to how far the consequences of defendant's acts should extend." *Id*.

A finding a proximate causation may be precluded by an independent or intervening act that is "not reasonably foreseeable," and thus constitutes a superseding cause. *Cook v. Seidenverg*, 217 P.2d 799, 803 (Wash. 1950). "An intervening act is not foreseeable if it is so highly extraordinary or improbable as to be wholly beyond the range of expectability." *Crowe v. Gaston*, 951 P.2d 1118, 1122 (Wash. 1998) (internal quotations omitted). "The foreseeability of an intervening act, unlike the determination of legal cause in general, is ordinarily a question of fact for the jury." *Id*.

"Cause in fact is generally left to the jury." *Hartley*, 698 P.2d at 83. "Legal causation . . .

---

[6] In his motion for summary judgment and his response to Plaintiff's motion for summary judgment, Defendant contends that Washington courts have interpreted the terms "direct" and "result directly" as requiring a proximate causation standard. (*See* Dkt. Nos. 28 at 13–15, 30 at 10.) In contrast, Defendant's reply brief in support of his motion for summary judgment contends that a proximate causation standard is inappropriate in this case, and ask the Court to reject *Plaintiff's* suggestion that such a standard should apply. (Dkt. No. 35 at 4–7, 10–12.) Defendant does not provide new legal authority or explain his shift in argument in his reply brief. (*See id*.) The Court declines to adopt Defendant's contrary argument raised in his reply brief, or his invitation to reject Plaintiff's arguments concerning proximate cause.

is a question of law for the court." *Colbert v. Moomba Sports, Inc.*, 163 Wash. 2d 43, 51, 176 P.3d 497, 501 (2008). "Where . . . the facts are taken as undisputed and the inferences therefrom are plain and do not admit of reasonable doubt or difference in opinion, the question of proximate cause becomes a question of law for the court." *Cook*, 217 P.2d at 802.

The question before the Court is whether there is a genuine dispute regarding whether Plaintiff's claimed damages—the outstanding balance of the A2 Loan—were proximately caused by the occurrence of the Recourse Obligations identified above.[7] Under the Guaranty, Defendant agreed to indemnify Plaintiff from "Costs" that "result[ed] directly" from the occurrence of a Recourse Obligation; therefore, the legal causation element of the proximate cause analysis is satisfied. (Dkt. No. 27-5 at 4); *see Hartley*, 698 P.2d at 82.

Defendant contends that Plaintiff's alleged damages did not "result directly" from the occurrence of one of the alleged Recourse Obligations. (Dkt. No. 28 at 19–22.) Defendant contends that WMNS's failure to make the rent payments necessary to service the A2 Loan constituted an intervening act, as WMNS was contractually obligated to make the payments even following a default by DeNovo. (*Id.*) Defendant may be correct that the Ground Lease and assignment of rents obligated WMNS to continue to make rent payments to Plaintiff regardless of DeNovo's actions. (*See* Dkt. Nos. 27-6 at 37, 27-3.) But although WMNS may have breached its duty to continue to make rent payments, Defendant has not established that such a breach was "so highly extraordinary or improbable as to be wholly beyond the range of expectability" and therefore constitute an intervening act sufficient to preclude a finding of proximate causation as a matter of law. *See Crowe*, 951 P.2d at 1122. Rather, WMNS's halting of rent payments may be part of a "direct sequence" between the occurrence of a Recourse Obligation and Plaintiff's claimed damages. *See Petersen*, 671 P.2d at 241. For example, WMNS's representative testified

---

[7] Because Plaintiff is no longer seeking damages based on the alleged default of the A1 Loan, the Court declines to reach Defendant's arguments concerning Plaintiff's reliance on the cross-default provisions in the A1 and A2 Loans and election to accelerate the balance of the A1 Loan. (Dkt. Nos. 28 at 21–22; 30 at 6, 9.)

that WMNS stopped making the rent payments to Plaintiff because of DeNovo's breaches of the Ground Lease. (*See* Dkt. No. 25-1 at 17–18, 25, 28–29.)

Defendant also argues that Plaintiff's election to accelerate the value of the A2 Loan following the default of payments on the A2 Loan constituted an intervening act. (Dkt. No. 28 at 21.) Under the Deed, the value of the A2 Loan could be accelerated and immediately become due upon the occurrence of one of the enumerated events of default. (*See* Dkt. No. 27-2 at 49–51.) Defendant has not demonstrated that Plaintiff's decision to attempt to exercise this right in seeking the outstanding value of the A2 Loan, as opposed to the rent payments not paid by WMNS to date, was "so highly extraordinary or improbable as to be wholly beyond the range of expectability" as to preclude a finding of proximate cause as a matter of law. *See Crowe*, 951 P.2d at 1122.

Therefore, Defendant has not established that the alleged intervening acts were unforeseeable as a matter of law, and therefore has not carried his burden of establishing that there is no genuine dispute that the occurrence of the Recourse Obligations did not "result directly" in Plaintiff's claimed losses. Defendant's motion for summary judgment is DENIED on this ground.

### F.     Attorney Fees

Defendant has requested reasonable attorney fees pursuant to the attorney fees and costs provision in the Guaranty. (Dkt. Nos. 27-5 at 12, 28 at 22–23) (citing Wash. Rev. Code § 4.48.330; *Hawk v. Branjes*, 986 P.2d 841 (Wash. Ct. App. 1999)). Defendant contends that he is entitled to an award of attorney fees and costs if he prevails on his motion for summary judgment. (Dkt. No. 28 at 23) (citing *Herzog Aluminum, Inc. v. Central Am. Window Corp.*, 692 P.2d 867 (Wash. Ct. App. 1984). As Defendant has not prevailed on his motion for summary judgment, the Court declines to award him reasonable attorney fees and costs.

### III.     CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment (Dkt. No. 24) is

GRANTED in part and DENIED in part. Defendant's motion for summary judgment (Dkt. No. 28) is DENIED.

DATED this 26th day of February 2019.

John C. Coughenour
UNITED STATES DISTRICT JUDGE